Carolyn **DALLEY, et al., Plaintiffs,**

v.

**MICHIGAN BLUE CROSS/BLUE SHIELD, INC., a Michigan corporation, Defendant.**

**and**

Susan **MULLICAN, et al., Plaintiffs,**

v.

**MICHIGAN BLUE CROSS/BLUE SHIELD, INC., a Michigan corporation, Defendant.**

Civ. A. Nos. 75–71244, 75–70510.

United States District Court,
E.D. Michigan, S.D.

June 26, 1985.

Ronald J. Reosti, Detroit, Mich., for plaintiffs.

Thomas G. Kienbaum, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

PHILIP PRATT, District Judge.

■ This opinion contains the court's findings of fact and conclusions of law on the merits of these consolidated cases. For the reasons stated below, the court finds that based upon the evidence the plaintiffs are entitled to 1.5 million dollars as a monetary award.

Under the terms of the consent judgment entered heretofore, the defendant Michigan Blue Cross/Blue Shield did not nor does not admit it engaged in discriminatory policies or practices. Further, the parties agreed that this court was not to make any determination that discrimination did, in fact, occur. Rather the court's role was confined to the evaluation of the statistical evidence and whether that evidence, which comprises the trial record in this case, warranted an award of damages of no less than $1,500,000, and no more than $4,500,-000. Thus, it should be clearly understood that the findings below are not intended nor should they be construed to constitute a finding of discrimination, nor, on the other hand, a finding that there was no discrimination.

## I. BACKGROUND

The above entitled consolidated class action cases charge that the defendant, Michigan Blue Cross/Blue Shield, Incorporated ("BCBSM"), a Michigan corporation, discriminated against women in initial placement and promotion practices between the years 1972 and 1982. The class is comprised of female employees in Management, Administrative and Technical ("MATs") or "exempt" positions in various divisions of the defendant. As certified, the class consists of approximately 4,300 women.

As is not unusual in class actions alleging discriminatory practices, progress was laborious and tedious. However, because of the unique settlement agreement reached by the parties and memorialized in a Consent Judgment entered by this court, only a brief recital of the procedural histo-

ry need be recounted, and that only for the purposes of providing the context within which this memorandum is to be viewed.

The cases were instituted in 1975 and alleged discriminatory practices to the disadvantage of women in every facet of defendant's employment policies and practices from initial hiring through discharge— or, as frequently characterized, "across the board" discrimination. The jurisdictional bases were the Equal Pay Act, 29 U.S.C. § 206, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.[1]

The "across the board" approach necessarily contemplated several thousand employees in both "exempt" and "non-exempt" positions.[2] Lacking pre-suit, hard facts regarding the internal workings of the defendant with regard to employment policies and practices, as opposed to anecdotal information, pre-trial discovery was an arduous task. The problem for both sides, was exacerbated by not only the sheer size of the undertaking, but also because of some significant developments. For example, in 1975, Blue Cross and Blue Shield, which had been separate entities, merged into a single corporation, and there was an amalgamation of personnel, records and policies; the introduction of the Hay System of job classifications and salary ranges; the refinement of the "across the board" charges to discrete claims; the honing of the class and the identification of appropriate representatives; legal developments concerning the viability of wage claims under the Equal Pay Act vis-a-vis Title VII wage claims; the advent of computerization of personnel records with its attendant problems of accurate and complete processing, retrieval and, eventually, preparation for statistical analysis.

Contributing most heavily to the complexity of the cases, particularly as it related to statistical proofs upon which the plaintiffs relied substantially, however, was the nature and structure of the defendant's organization. The health care business is highly sophisticated and includes many diverse technical and professional disciplines. As the class evolved, it became readily apparent that the positions in the company did not constitute a fungible group. Job descriptions numbered in the many hundreds; skills, education and experience factors were not interchangeable; job descriptions ran the gamut from doctors, dentists, lawyers, accountants, actuaries, marketing specialists and media representatives through computer analysts, customer billing consultants and related technical fields. Thus, the frequently used approach of merely comparing raw average pay differentials, for example, would be inappropriate, if not impossible. Consequently, the proposed utilization of statistical evidence at trial required exhaustive research, translation, and preparation. In addition, of course, were the problems associated with the investigation, discovery, and preparation of anecdotal evidence with relation to specific acts or conduct of management from hundreds of employees. Eventually these obstacles were overcome and trial, after several adjournments, commenced on December 15, 1983.

After the second day of what was anticipated to be a 12 to 16 week trial, the parties advised the court that settlement negotiations had reached an encouraging level. At the suggestion of the parties, conferences were held with the court and culminated in a proposed Consent Judgment. Trial was suspended and the requisite procedures under Federal Rules of Civil Procedure, Rule 23 to effectuate the settlement were conducted. On March 26, 1984, the court conducted a hearing concerning the propriety of the proposed agreement and found that the Consent Judgment should be approved and entered. On April 6, 1984, the court issued its Order Approving the Consent Judgment.[3]

The Consent Judgment[4] can only be described as unique and a brief exposition

---

**1.** Subsequently, the matters were limited to the Title VII claims.

**2.** See *infra* note 8.

**3.** A copy of the Memorandum Opinion and Order Approving the Consent Judgment is attached as Appendix "A".

**4.** A copy of the Consent Judgment is attached as Appendix "B".

will facilitate an understanding of the issues to be determined and the focus of this Opinion. Foremost, the Consent Judgment essentially assumes liability. It does not suggest, and the court does not mean to imply, that BCBSM admits to discriminatory policies and practices, but the consent decree transforms the issue of liability into a question of relief. Further, the Consent Judgment concerns itself with equitable relief. It recognizes and contains certain modifications which had been previously implemented by the defendant with respect to employment practices as they affect women and other minorities. It also included additional modifications in employment practices to assure related, non-discriminatory policies and practices.[5] These provisions were final and needed no further judicial consideration.

The unique feature of the Consent Judgment dealt with the issue of monetary award. The court previously described the pertinent provisions in this regard as follows:

> The issue of monetary award has been hotly disputed. The disagreement does not rise simply from the relative merits with which each party perceives the case, but also from the size of the class and the variety and number of the positions involved. In an effort to compromise, the parties have agreed to a floor and ceiling regarding an award of 1.5 million and 4.5 million, respectively. These figures represent the minimum and maximum of the linear range of awardable damages. The exact figure is to be established by the Court after a trial on the merits. Under the proposed judgment, trial will be limited to the submission of statistical evidence. At the conclusion of this presentation and any rebuttal the parties deem necessary, the Court will fix damages on the "strength" of plaintiffs' statistical case. Thus, if plaintiffs make no showing of discrimination with the statistical evidence or if that showing is very weak, then plaintiffs will only be

entitled to 1.5 million. Conversely, if the plaintiffs' case is very "strong," then the Court will award 4.5 million. In the event plaintiffs' statistical case is neither "weak" nor "strong," but falls somewhere in between, then the Court will assess the award appropriately between 1.5 and 4.5 million. Moreover, whatever plaintiffs' recovery, the decree provides for the payment by defendant of reasonable fees and costs incurred by plaintiffs, thereby protecting the fiscal integrity of the award.

Memorandum Opinion and Order Approving Consent Judgment, April 6, 1984, at page 6.[6] Further, the Consent Judgment provided that:

> In determining whether a "case" has been made out, or to what degree a case has been made out, the Court should take into consideration the totality of all evidence before the Court at the conclusion of the statistical presentation which is within the guidelines set above.
>
> ... The Court is not to be governed solely by a statistical dollar analysis which may show dollar differentials in excess of the maximum of the range. Such showings are only intended to be evidence of the strength (or lack of strength) of the overall case and are not intended to have a dollar for dollar relationship to the amount of the award. On the other hand, the parties contemplate that the Court will take into account the period of time, if any, during which the Court concludes the plaintiffs have shown the existence of a "case" of discrimination, the nature of the discrimination, together with the strength of that showing.

Consent Judgment, at pages 7 and 8.

The effect of these provisions is to modify the usual order of proof and the customary step-by-step analysis suggested by the Supreme Court in such cases as *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93

---

**5.** In section I of the Consent Judgment entitled "Affirmative and Equitable Relief" BCBSM agreed to various procedures to ensure fairness

in promotions in the MAT ranks and to provide training for MAT employees.

**6.** See Appendix "A".

S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), which direct, in brief, that the plaintiff must first establish a prima facie case, the defendant must show business necessity, and the plaintiff must establish that the asserted business necessity is pretextual. The ultimate burden, however, is always to remain with the plaintiff to prove the fact of discrimination.[7]

In accordance with this agreement, the court conducted the trial in a one week period, the parties submitted post-trial statistical rebuttals and briefs and the case is now ripe for decision.

## II.  INTRODUCTION TO STATISTICAL EVIDENCE

The plaintiff class is composed of non-clerical employees during 1972 to 1982 and restricted to the managerial ranks.[8] As adverted to above, the "across the board" attack on alleged discriminatory employment practices eventually resolved itself into two issues: did the defendant discriminate against women in (i) initial placement in the MAT ranks, and (ii) promotions within the MAT ranks.

Pursuant to the Consent Judgment, the parties presented statistical evidence in the following fashion. First, Barbara R. Bergmann, Ph.D., testified on behalf of the plaintiffs and submitted her studies and reports. Finis Welch, Ph.D., then testified for defendant and presented his studies and reports. Trial was recessed[9] and thereafter Mark R. Killingsworth, Ph.D., submitted a written report on behalf of plaintiffs' analyzing the statistical evidence presented by Dr. Welch; and Edward D. Rothman, Ph.D., for defendant, presented a written "Evaluation and Critique of Studies Presented by Dr. Bergmann and Dr. Welch." These reports were followed by Dr. Bergman's and Dr. Welch's respective submission of written surrebuttal reports. Finally, the parties presented final arguments in post-trial briefs.[10]

Prefatory to the discussion of the statistical evidence, the following observations are in order. As mentioned, the court is not to apply strictly the traditional rules concerning the burden of proof pursuant to the Consent Judgment. The award in this case is to be set by the "strength" or "weakness" of the plaintiffs' case and not by a showing of discrimination by the preponderance of the evidence. The "strength" of plaintiffs' case, to the extent that plaintiffs introduced statistical evidence, has been substantially undermined because of the lack of worth of the studies and reports submitted by Dr. Bergmann on plaintiffs' behalf. Virtually all of Dr. Bergmann's reports contain a substantial number of data and specification errors and thus conclusions and results of these

---

**7.** The Consent Judgment provides that the award must be limited to the lowest figure if "the plaintiffs fail to meet their required burden of proof of showing class wide [sic] discrimination, whether defined as a prima facie case, or on the basis of the statistical presentation ..." Consent Judgment, at page 7.

   See *Segar v. Smith,* 738 F.2d 1249 (D.C.Cir. 1984), for a discussion of the relative burdens of proof under traditional doctrines in cases concerning statistical evidence.

**8.** Managerial ranks is a generic term used only for convenience. Changes and modifications in personnel and administrative structuring over the 10 year period resulted in the utilization of such terms as "MATs," "exempt," and "grade 7 and above." The terms were used interchangeably throughout the testimony and may lead to some confusion. However, there is no difference in substance.

**9.** There was some additional testimony from BCBSM employees regarding policies and practices which are addressed subsequently. *See infra* text at notes 25–26.

**10.** Prior to the trial on the statistical evidence, counsel for both sides strongly urged the court to retain its own expert. The court acceded to that request and counsel submitted their respective preferred experts. The expert named in common by both sides was Belton M. Fleisher, Ph.D., of Ohio State University, and with the consent of the parties, the court retained him. Professor Fleisher is a nationally known labor economist and his assistance to the court was invaluable. Of particular aid in understanding the intricacies of the issues herein was Professor Fleisher's book entitled *Labor Economics: Theory, Evidence and Policy,* (3d Ed., Prentice Hall 1984). Another helpful source was E. Mansfield, *Statistics For Business & Economics,* (2d Ed., W.W. Norton & Co. 1983).

reports can be accorded little weight. As Dr. Rothman correctly emphasized in his critique,[11] Dr. Bergmann made several computer processing errors in classifying and assigning information with such frequency as to discredit any findings produced from this data. Further, Dr. Bergmann systematically based her studies on the incorrect sample populations so as to bias her results. Additionally, almost all of Dr. Bergmann's reports failed to provide adequate statistical models to evaluate the data meaningfully. *See Valentino v. United States Postal Service,* 674 F.2d 56 (D.C. Cir.1982).[12] In short, Dr. Bergmann's reports did not achieve the necessary standards of statistical reliability be considered helpful in the determination of the issues before the court.[13]

Plaintiffs implicitly recognize the severe deficiency of Dr. Bergmann's analysis and reports in their final arguments. Not only do plaintiffs not attempt to rehabilitate Dr. Bergmann's testimony from the considerable criticism of defendant's experts, but the plaintiffs do not rely on one report or study of Dr. Bergmann in arguing that the evidence established discriminatory hiring and promotion practices of the defendant. *See* Plaintiffs' Post-Trial Brief. Instead, plaintiffs rely upon the data and much of the analyses of Dr. Welch and Dr. Killingsworth to present Dr. Welch's reports in a way favorable to plaintiffs. Consequently, the arguments of the parties are not based upon the studies of their respective experts but are grounded on their interpretation and, in the plaintiffs' case, modifications of Dr. Welch's studies. But for the defendant's expert's studies, there would be no competent evidence before the court to make any finding of discrimination. Hence, in weighing the "strength" of plaintiff's case, the court is mindful of plaintiffs' failure to produce competent, affirmative evidence showing discrimination.

## III. THE STATISTICAL EVIDENCE

The central issues in this case are whether comparably qualified women and men MAT employees received different treatment in their initial assignments and salaries and in their chances for promotion. As is generally necessary in discrimination cases, the procedure is to compare and contrast the treatment of individuals with *comparable* qualifications. In a case based primarily on statistical evidence such as the instant case, the procedure is to present statistical models which best demonstrate the treatment of comparable individuals. Commonly:

[t]o be legally sufficient these statistics must show a disparity of treatment, eliminate the most common nondiscriminatory explanations of the disparity, and thus permit the inference that, absent other explanation, the disparity more likely than not resulted from illegal discrimination ...

... A plaintiff's statistical evidence must therefore focus on eliminating this nondiscriminatory explanation by showing disparities in treatment between individuals with comparable qualifications for the positions at issue.[14]

11. Since Dr. Rothman does a thorough and accurate job of detailing Dr. Bergmann's errors, and since the plaintiffs do not seriously or adequately argue to the contrary, for the sake of brevity the court will not discuss extensively the substantial problems in Dr. Bergmann's reports.

12. *See infra* notes 19 and 22 and accompanying text.

13. It should be noted that statistical analysis of the personnel records of the defendant presented a sizeable task. The information was kept on computer tapes in a form which did not lend itself to the statistical studies necessary for this case. Further, because this case concerns upper level managerial and supervisory positions in specialized areas, certain information, such as aspects of an individual's background and qualifications, were not fungible and had to be precisely codified and classified. It may have been that these difficulties coupled with the demands of her academic career prevented Dr. Bergmann from attaining the proper level of professionalism in her studies in this case. In other cases, however, Dr. Bergmann's work has been favorably recognized. *See Segar v. Smith,* 738 F.2d 1249 (D.C.Cir.1984).

14. *E.g., Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

The best known statistical method [15] and the method chosen by the experts in this case is statistical analysis by multiple linear regressions. Multiple linear regressions are mathmathical formulas which indicate how one variable is related to another. The object of this analysis is to determine the effect of sex, race, or age—the basis of the discrimination claim—on such aspects of employment as salaries, placements, and promotions. This analysis requires that comparable qualifications be accounted for so that the difference in salaries or promotions between persons of different races or sexes can be traceable to the variable of sex or race and not to dissimilar job qualifications and skills. Typically the independent variables will consist of factors which bear on productivity, such as educational level and prior experience. These variables are then analyzed by the use of computers through various formulas in relation to such independent variables as sex, age, or race and certain dependent variables such as wage and promotional rate. The object of this analysis is to determine whether after all relevant factors bearing upon productivity have been accounted for there remains a disparity in the treatment of employees based upon their race or sex. This disparity is normally shown in terms of different wage levels or rates of promotion.[16] Thus, a critical aspect of this form of analysis is determining the variables which should be included in the regression. As stated in *Segar v. Smith*, 738 F.2d 1249, 1261 (D.C. Cir.1984) (citations omitted):

> The first step in multiple regression analysis is specification of the independent variable. The choice of proper explanatory variables determines the validity of the regression analysis. A coherent theory, devised prior to observation of the particular data, must be employed to select the relevant explanatory variables. ... When the proper variables have been selected, the multiple regression analysis is conducted, generally by a computer. In essence, the regression measures the impact of each explanatory variable upon the dependent variable [e.g., salary] by holding all other explanatory variables constant. The analysis yields figures demonstrating how much of an observed disparity in salaries can be traced to race, as opposed to any of the other potential explanatory variables [e.g., educational level].

The results of these analyses are numeric figures representing, in this case, percentages or dollars. The reliability of

---

15. *E.g., Segar v. Smith*, 738 F.2d 1249, 1261 (D.C.Cir.1984).

16. Consideration of the following explanation and example may be helpful:

> Multiple regression is best understood by starting with the simpler case of linear regression. Suppose an employer claims to pay workers only according to their years of company seniority. An employee alleging sex discrimination would wish to test this claim by measuring the increase in wage due to an additional year of seniority for male employees and then separately for female employees. The information available on the hourly wages and seniority of a number of employees might not be directly interpretable, however, because of the inclusion of unknown amounts of overtime pay and other uncertainties.
>
> The characteristic to be explained (each employee's wage) may be shown on the verticle side of a graph and the explaining factor (years of experience of each employee) may be shown on the horizontal. One point on the graph would represent each employee about whom information is available. Linear regression estimates a line to be drawn among those points. If the effect of overtime and other uncertainties is negligible, the points will all lie along one line, and the slope of that line will reflect the wage increase for each additional year of seniority. If, on the other hand, there were substantial unexplained influences, the points will not line up exactly. Any of several lines could fit the points equally well, as far as the eye can tell. Regression chooses the line that best depicts the relationship among the underlying data according to a mathematical formula that allows an estimate of the certainty of the predicted relationship. *See Snedecor, supra* note 35, at 147. *See also* N. Draper & H. Smith, Applied Regression Analysis 9 (1966). Multiple regression simply expands the linear regression methodology to more than one explaining factor.

Note: *Beyond The Prima Facie Case in Employment Discrimination Law: Statistical Proof and Rebuttal,* 89 Harv.L.Rev. 387, 397–98 (1975) (hereinafter referred to as *"Beyond The Prima Facie Case"*).

these figures is weighed by a measure known as the "T-Ratio." The T-Ratio reflects the probability that the result obtained could have occurred by chance. Simply, the T-Ratio indicates how likely it is that the result of the regression was produced by chance. If the result is not likely the product of chance then it is concluded that it represents a true relationship between the measure of discrimination (e.g., wage rate) and an independent variable (e.g. sex or education). Generally, the higher the T-Ratio the less likely that the figures are based on chance.[17] The experts in this case have followed the commonly recognized standard that a T-Ratio of approximately 2.0—indicating a 5% probability or a one in 20 probability that the observed result could have occurred by chance—or above indicates that the figure is statistically significant.[18]

In determining the variables to be used in the regressions in this case, the nature of the job positions and the composition of the personnel needs further explanation. The positions in the MAT ranks vary substantially. Low level MAT employees generally perform simple clerical work in pro-

cessing claims, while upper level MAT positions require system analysts, actuaries, lawyers, doctors, and other professionals. Further, the nature of the defendant's business requires a wide variety of specialties ranging from the medical profession to computer programing. The duties and skills necessary for many of the positions are not easily defined and are not readily comparable. The positions at issue here are quite diverse, necessitating individuals with specialized backgrounds. Hence, since MAT positions require and are composed of individuals of divergent backgrounds, to be meaningful multiple regressions must employ a considerable degree of sophistication in the selection of data and its field of variables.[19]

Not only are the skills and backgrounds required to perform MAT positions generally not fungible, there appears to be a sizeable difference in the backgrounds of male and female MAT employees.[20] Dr. Welch presented studies concerning the composition of the qualifications of MAT personnel which the plaintiffs did not dispute. Women account for two-thirds of MAT employees, yet 43% of the women

---

17. *See e.g.,* B. Fleisher & T. Kniesner, *Labor Economics: Theory Evidence and Policy, supra,* Chapt. 2; Mansfield, *Statistics For Business & Economics,* 248–50, 327, 333, 378; Note: *Beyond The Prima Facie Case, supra,* note 15, at 398–99, and note 49.

18. Most courts and commentators have accepted the .05 level. *E.g. Segar v. Smith,* 738 F.2d 1249, 1282 (D.C.Cir.1984); D. Baldus & J. Cole, *Statistical Proof of Discrimination,* 297 (1980).

19. In *Valentino v. United States Postal Service,* 674 F.2d 56 (D.C.Cir.1982), the court commented on a situation similar to the one presented in the instant case:

Multiple regression analysis is a statistical method for making "quantitative estimates of the effects of different factors on some variable of interest." Fisher, *Multiple Regression in Legal Proceedings,* 80 Colum.L.Rev. 702, 702 (1980). The regression technique has come into vogue in employment discrimination cases as a means of estimating the discrete influence factors such as sex, experience, and education have had on determining salary level. *See, e.g.,* Finkelstein, *The Judicial Reception of Multiple Regression Studies in Race and Sex Discrimination Cases,* 80 Colum.L. Rev. 737 (1980). Valentino's regression analy-

ses attempted to estimate how much influence sex, length of government service, and years of education had on the salaries of USPS employees. Her analyses might have been impressive were this a case in which the women and men in the employer's work force held similar jobs. *See Trout v. Hidalgo,* 517 F.Supp. 873, at 883 (1981) ("all members of the class [were] professional technical employees with generally similar job skills"). But Valentino utterly failed to control for type of education and job classification, *see* Fisher, *supra,* 80 Colum.L.Rev. at 721 n. 32. The array of positions at issue and the difference in the availability of men and women in the nation and at USPS for the varied high level professional and administrative positions filled at Headquarters stripped her analyses of the significance she would attribute to them. 674 F.2d at 70–71.

20. Plaintiffs' challenge to the defendant's policies and practices of initial assignment into MAT positions concerns the placement of comparably qualified men and women into different jobs to the disadvantage of women. Plaintiffs are not claiming that the defendant would hire men rather than women, but that defendant would place equally qualified women in lower positions.

compared to 12.7% of the men were hired when they were 21 years or younger. Conversely, almost twice the percentage of men (36.8%) were hired over the age of thirty as compared to women over 30 (19.4%). Almost half (47.8%) of the women MAT employees did not have any education beyond high school, while only 14.1% of the men had no further education. As to bachelors degrees, only 12.2% of the women, compared to 53.8% of the men, obtained this degree. Moreover, 14.4% of the men hold advanced college degrees versus only 2.3% of the women.[21]

Dr. Welch reported:

Sex differences in education levels are further amplified by examining fields of specialization.

\* \* \* \* \* \*

The trade business and technical school group provides an example of the kinds of differences found throughout the table. Half of the men specialized in computer, math, and actuarial whereas half of the women specialized in secretarial and keypunching.

If we add together the first three specialities, business economics, engineering, drafting, and computer, math, actuarial sciences, we see that proportionately more than twice as many men as women majored in these areas. They account for 61.9, 72.1, and 57.7 percent of the men who, respectively, had some college, a bachelors degree, or an advanced degree, but they account for only 22.7, 29.9, and 25.3 percent of the women at these levels.

21. The following table (Table 2.2) was presented by Dr. Welch in his November 7, 1983, report:

#### Education of Work Force

| Educational Level | Women | Men |
|---|---|---|
| High School Diploma or Less | 47.9% | 13.9% |
| Trade, Business, or Technical | 8.7 | 3.9 |
| Some college | 31.3 | 28.2 |
| Bachelors Degree | 9.8 | 39.5 |
| Advanced Degree | 2.3 | 14.5 |
| Total | | |
| Percentage | 100.0 | 100.0 |
| Number of Persons | 3,041 | 1,530 |

Dr. Welch's November 7, 1983 Report, at page 7.

Dr. Welch further reported that men and women also differ in their prior experience. Fifteen percent of the men previously worked as computer operators or programmers, while only 1.5% of the women previously performed such work. Further, Dr. Welch commented:

... 72.4 percent of the women entered these grades through promotion from lower grades [non-MAT positions]. Since promotion is most often one or two grade levels, these entries result in our first seeing the majority of women in the lower ends of the [MAT] grade range. In contrast, 27.8 percent of the men enter the reference range via promotion while 72.2 percent were hired directly into these grades.

Dr. Welch's Report of November 7, 1983, at page 7.

Elsewhere, Dr. Welch notes that male MAT hires (37.5%) are more likely than female MAT hires (11.0%) to have their longest job experience as an accountant or controller, programmer, or manager. Moreover, Dr. Welch's study demonstrated that 61.5% of men compared to 22.5% of the women had their longest previous jobs in a specialized field relevant to the insurance industry. Among female MAT employees 28.4% of their prior career was predominantly clerical or secretarial while only 5.8% of the male MAT employees had such prior experience.[22]

It is against this background that the plaintiffs challenge the defendant's policies and practices in the initial assignment and

22. These figures are set forth in Dr. Welch's Report of December 16, 1983, at page 11.

The divergent backgrounds of male and female MAT employees highlights the problems of performing meaningful regression analyses. As these studies show, men generally possess greater qualifications than women. If regression analysis is to be meaningful and capable of determining if men and women of comparable qualifications are treated differently, the relevant variables concerning productivity must be properly accounted for or a disparity in favor of men is almost certain to result. One major flaw with Dr. Bergmann's studies is her failure to

promotion of comparably qualified men and women.

## A. *Initial Assignment*

Plaintiffs allege that women were discriminated against by defendant in their initial placement into the MAT ranks. This challenge does not concern employees who were in a non-MAT position then promoted to the MAT ranks, but only those who were initially hired into MAT levels. Since more than 70% of women MAT employees reach MAT positions through promotions from non-MAT jobs, this dispute concerns less than a third of all MAT female employees.

As a benchmark or indicator of the treatment of men and women in initial assignment, the experts' studies focused on the initial salary of new hires to determine if men and women of comparable qualifications received comparable salaries. Dr. Welch determined that the "raw differential" between men and women when the only independent variables are sex, the year of hire and full or part-time work, was 23.8% to the disadvantage of women. When Dr. Welch accounted for educational background through various independent variables the sex differential or coefficient decreased to 16.7% to the disadvantage of women. Dr. Welch ran a further regression which accounted for the type, length, and continuity of previous experience[23] and found a sex differential of 5.9% to the disadvantage of women, with a corresponding T-Ratio of 2.8. Finally, Dr. Welch performed a study which contained an additional variable which purported to represent the job requested by the employee on his or her application for employment. This regression resulted in a sex coefficient which showed no advantage to men over women. Hence, if Dr. Welch's regressions and analyses are accurate there is no showing of discriminatory conduct by the defendant in its initial hiring practices and policies.

Plaintiffs concede the accuracy of Dr. Welch's regressions which account for education and much of the regression which considers prior experience. Plaintiffs present two primary objections to the remainder of Dr. Welch's studies. First, plaintiffs contend that Dr. Welch improperly implemented and used the "job requested" variable. Second, plaintiffs argue that Dr. Welch inappropriately used female interaction terms in the context of blank job request applications and leading career gaps.[24]

Plaintiffs assert that a proper study would not include the "job requested" variable or the female interaction terms. Plaintiffs calculate that if these two objections are factored into Dr. Welch's study, then the sex coefficient or the disparity between comparably qualified men and women would be 7.5% to the disadvantage of women. Plaintiffs determined that the female interaction term used for the "leading gap," a factor in Dr. Welch's prior experience variable, accounts for 1.6% of the raw differential. Dr. Welch's regression which accounted for education and prior experience found a sex differential of 5.9% to the disadvantage of women. If plaintiffs' argument is credited then that figure would be 7.5%. Plaintiffs assert that the use of the "job requested" variable is inappropriate and should not be considered by the court; thus the correct sex coefficient to be derived from Dr. Welch's regression which accounts for education and prior experience without a female interaction variable is the 7.5% figure.

Plaintiffs argue, in the alternative, that if there is some appropriate use for the "job requested" variable, the female interaction term used within that variable is improper. That female interaction term, according to plaintiff, accounts for nearly 3.5% of the sex differential. Thus, if that

---

take into account such variables. *See supra* notes 12 and 19 and accompanying text.

**23.** Because of the detailed information available to the experts as well as the divergency and specialization of the qualifications of MAT employees, these variables are composed of complex series of formulas. For the sake of brevity and clarity, the court will only discuss those aspects of the variables which are in controversy.

**24.** For an explanation of the female interaction terms, *see infra* notes 28, 30, 35, 43 and accompanying text.

**1454**

term were excluded then there would be a sex coefficient of 3.5% even accepting all other calculations and variables used by Dr. Welch.

The following table summarizes these figures:

| Regression | Sex Coefficient (negative signifies to the disadvantage of women) |
|---|---|
| Raw Differential ("R.D.") independent variables include sex, year of hire, full or part-time | −23.8% |
| R.D. with education variable | −16.7% |
| R.D. with education and prior career without female interaction term variables | −7.5% |
| R.D. with education and prior career with female interaction term variables | −5.9% |
| R.D. with education, prior career and "job requested" without female interaction term variables | −3.5% |
| R.D. with education, prior career and "job requested" with female interaction team variables | 0.0% |

A detailed discussion of plaintiffs' arguments follows.

Plaintiffs' first objection concerns Dr. Welch's use of the "job requested" variable. The "job requested" variable reflects the job or position which is requested on the application for employment. Dr. Welch justified the use of this variable because of perceived problems with the data. The application used by BCBSM provided four blanks for candidates to fill in their prior employment experience. If a candidate had more than four prior jobs then this information was not picked up in the data. Further, several applicants did not bother to fill in more than one or two prior jobs, although it could be inferred that the candidate had more experience. More importantly, there existed the problem of classifying the prior experience and education provided by the candidates in a way that allowed for statistical comparison. At trial Dr. Welch presented a study (summarized in Exhibit DF) which demonstrated this problem. The study showed that using reasonable statistical assumptions about the information provided, accurate salary levels could not be readily predicted. Many

individuals, both male and female, actually received salaries much higher or lower than would be predicted from their application material. Dr. Welch explained that this occurred because of the ambiguity of the applicants' descriptions of their backgrounds, the unfamiliarity of the statistician with certain fields, which led to improper valuation of experience or education, and the absence of other relevant information which was not written on the application. Dr. Welch opined that the "job requested" variable overcomes this problem because "the particular job for which an individual applies can summarize some important dimensions of the individual's level and type of skill at the time of hire." Dr. Welch's December 16, 1983 Report, at page 18. According to Dr. Welch, this variable's prime value is that it "has the capability of distinguishing a special niche in skills between people with specialized talents and the firm ..." Transcript, March 29, 1984, at page 839.

Dr. Welch also supplied several studies to support the reliability of the "job requested" variable. The first showed the high correlation between applicants' prior careers and the job requested. Dr. Welch examined those who requested positions in the areas of computer programming and accounting among all hires. This study showed that 85.1% of the men and 84.9% of the women who applied for the position of programmer had related experience or education. The study also revealed that 88.7% of the men and 82.6% of the women who applied for accounting positions had prior experience or education in that field. The study further demonstrated that 93.0% of men and 100.0% of the women who requested programmer positions had their longest previous prior occupation in that field. While 88.6% of the men and 93.8% of the women who requested accounting had their longest prior occupation in the accounting field.

A second study submitted by Dr. Welch explored the correlation between the prior career and the job requested in the area of clerical employees. The following table summarizes that study:

Type of Prior Experience of Those Requesting Clerical Jobs

### All Hires

| Experience | Women | Men |
|---|---|---|
| None | 29.1% | 31.0% |
| Secretary | 16.2% | 1.6% |
| Other Clerical | 29.1% | 13.9% |
| Subtotal | 74.4% | 46.5% |
| | | |
| Experience Relevant to Insurance Industry | 1.1% | 7.1% |

### MAT Hires

| Experience | Women | Men |
|---|---|---|
| None | 5.0% | 21.7% |
| Secretary | 15.0% | 0.0% |
| Other Clerical | 25.0% | 21.7% |
| Subtotal | 45.0% | 43.4% |
| | | |
| Experience Relevant to Insurance Industry | 7.5% | 13.0% |

Another study offered by Dr. Welch concluded that "[m]en and women not only arrive at BCBSM with very different kinds of backgrounds, they also seek to utilize their abilities in different kinds of jobs." Dr. Welch's December 16, 1983 Report, at page 20. This study revealed that two-thirds (66.9%) of all women hired, in MAT and non-MAT positions, asked to be placed into clerical positions, compared to 19.2 percent of the men. Furthermore, 53.2% of all men hired requested positions as a computer programmer, financial, and analyst categories compared to 8.7% of all women hired.

The final studies relevant to the reliability of the "job requested" variable concerned the likelihood that men and women would receive the job and pay wage they requested. The results of this study are reported in Tables 5.1 and 5.2 of Dr. Welch's December 16, 1983 Report. These studies show that women and men were equally likely to get the job and pay wage requested.

The plaintiffs raise several arguments against the use of the "job requested" variable, but only one deserves comment.[25]

**25.** Plaintiffs present three other arguments against the use of the "job requested" variable which the court finds are meritless. First, plaintiffs claim that "there is no *meaningful* prior job information which is 'missing' " to require the use of this variable. Plaintiffs' Post-Trial Brief, at page 17 (emphasis in original). Plaintiffs contend that all the necessary information is on the application and that there is nothing missing. Not only do plaintiffs not offer any support for this conclusion, but plaintiffs misunderstand Dr. Welch's reference to "missing" information. Dr. Welch was not simply referring to information missing from the application, but also to the problem of classifying prior career experience and education from the applicant's description in statistically meaningful ways.

Second, plaintiffs criticize the use of this variable because "Dr. Welch cannot quote any reputable text on statistics or econometrics to support his claim that the use of 'job request' data is justified because without it, neither he nor Dr. Bergmann were terribly successful in predicting individual salaries." Plaintiffs' Post Trial Brief, at page 17–18. Again plaintiffs' argument mischaracterizes Dr. Welch's intent. Dr. Welch's study concerning the predictive value of the job applied for was to demonstrate the statistical problems of codifying applicants' prior careers from their descriptions. The "job requested" variable is not intended as a predictive study, but to overcome the codification and the missing information problem. Its predictive qualities are not its primary use.

There does appear to be a taint to the reliability of this variable due to the possibility of "steering" performed by BCBSM personnel. The studies presented by Dr. Welch would be very convincing if they were unquestionably generated by the applicant and not the result of actions by BCBSM personnel. However, the practice and policies of the defendant contain the potential for steering.

First, several of the job requested blanks on employee applications (as high as 16%) were filled in by someone other than the employee, most likely BCBSM personnel responsible for hiring.

Second and importantly, many of the applications have requests for positions under the very specific and unique names used by the defendant. Apparently the names of these positions would not be known to persons not already or previously employed by defendant unless informed by a BCBSM employee. Terry Rotare, defendant's senior personnel representative, testified that approximately 75% of the MAT hires apply to BCBSM due to the defendant's use of advertising agencies, employment agencies, federal and state agencies, and newspaper and trade journal advertisements. Such candidates would usually fill out their applications when they came to the defendant for an interview. She further testified that the BCBSM would many times give the employment agencies or sources the generic name of the position to be filled and not the specific name used by the company. Ms. Rotare testified under cross-examination as follows:

Q. And when you send the listing of job names to the agencies, is there any policy requiring whether or not you use generic names or the company's specific name for the job?

A. A notification of a job opening that is sent to, let's say, an employment agency, for example, or even some of the more professional type associations, we send a copy of what we call a job posting, which would have the generic title on it.

Transcript, April 3, 1984, at page 1152. Ms. Rotare explained further during redirect examination:

Q. ... You indicated the title you refer to, whatever source we're talking about, would be the generic title. That was a term suggested to you by [plaintiff's counsel] in his question.

What is your understanding of the term generic?

---

Finally, plaintiffs claim that Dr. Welch's coding of the job requests was biased. Dr. Welch hand coded this data and plaintiffs assert that his subjective judgment concerning classification of the requests biased the results so as to eliminate any differentials between men and women. In their post-trial briefs, plaintiffs present studies, calculations, and tables never before presented to show the problems of Dr. Welch's methods of codification. Initially it should be noted that it was improper for plaintiffs to first present this information in this form. The parties had agreed that all evidence and reports would be presented during the testimony or in the rebuttal reports. The parties' post-trial briefs were to act as their closing arguments, not as a vehicle for the introduction of further evidence. Plaintiffs' expert, Dr. Killingsworth, raised this issue concerning Dr. Welch's coding in his critique at page 7. The new calculations, figures, and evidence should have been presented at that time. Instead, Dr. Killingsworth merely cited a few examples of errors without explaining how these errors can be generalized to the entire study. Dr. Killings-

worth did not raise the panoply of alleged coding errors raised by plaintiffs in their post-trial brief. If he had, the court would have been benefitted by a counter-argument in Dr. Welch's surrebuttal which would have permitted this issue to be properly considered. In its present form, however, the court is left with several charts and figures in plaintiffs' post-trial brief with no adequate method of determining their accuracy. This is the exact problem which the post-trial schedule for submitting rebuttals and surrebuttals was trying to avoid.

Furthermore, even if the merits of plaintiffs' arguments here are considered there still remains the problem that although plaintiffs show that there were some mistakes in coding, plaintiffs still fail to demonstrate that these errors were so generalized and so pervasive that the entire study is invalid. Aside from a handful of clear errors, many of the supposed errors pointed out by Dr. Killingsworth in his critique and in the Appendix to plaintiffs' post-trial brief are not errors necessarily indicative of biased, subjective judgments which call Dr. Welch's method of codification into serious question.

A. Um, I guess you'd say original, true, clear.

\* \* \* \* \* \*

Q. What is the difference, in your view? And I refer you to your direct testimony, where you said you gave the specific job title to the source. You testified, in response to (plaintiffs' counsel's) question, that you would give the generic title. What is the difference?

A. Okay. I'm thinking of, for example, when we're looking for an industrial engineer. We would put an ad in the newspaper that we're looking for Industrial Engineers, but our job title says, Production Analyst.

Q. All right. And the generic title is what?

A. Well, I would say Industrial Engineer.

Q. In that instance, that's the name you would put in there?

A. Right.

Q. And are there other times when you put no specific title, the way you use it, into the advertisement?

A. Um, it varies, right ... We wouldn't catch the eye of the applicant if we said Production Analyst, for example.

Transcript, April 3, 1984, at pages 1157–58.

This testimony revealed that the job requested information was generally not provided until the candidate was at an interview and that many of the candidates could not have filled in the specific job title which appears for job requested on their application without the guidance of BCBSM personnel. Thus, there is the *possibility* that BCBSM personnel could "steer" women into less favorable jobs than male applicants by instructing them on which job to request.[26]

The possibility of steering taints the reliability of the "job requested" variable, but this possibility by itself is not compelling enough to discount totally the value of this variable. Dr. Welch presented several studies discussed above which supported its use. Of particular significance is his study which correlates the job requested by applicants with their education and prior career. This study suggests that the job requested information was not influenced by steering by BCBSM personnel. Given the possibility of steering, on the one hand, and the studies showing the reliability of the variable on the other, the court concludes that the "job requested" variable cannot be fully accepted by the court nor totally rejected, but its value should be appropriately discounted.[27]

Plaintiffs' second major objection concerns Dr. Welch's use of a sex interaction term. This term considers and weighs, within the regression, whether certain data is derived from male or female employees. Dr. Welch used these terms in two situations. First, some of the employees' applications did not have any information for the job they were requesting. Dr. Welch used a female interaction term where the job requested was left blank. Second, the prior careers of several candidates were not fully described in their applications. The applications only permitted candidates to fill in their last four prior jobs. If the candidate had more than four jobs, then a "gap" in the information occurred because there was no information concerning activities from the time the applicant ended his or her education until the time of the earliest recorded job. Dr. Welch labeled this gap of information a "suspicious leading gap"—"suspicious" because the employee may have been active during this period in

---

26. But for this possibility of steering, the "job requested" variable would have been an acceptable device which has been recognized by other courts. For example, in *E.E.O.C. v. Kimbrough Investment Co.*, 703 F.2d 98 (5th Cir.1983), the court found that the "job requested" variable was entirely appropriate and rejected plaintiffs' regressions which did not contain this factor. In *Kimbrough*, however, the court was not presented with the problem of steering.

27. It would be folly for the court to attempt to establish a diminished value for this variable in terms of the reduction of the sex differential. The court neither has the evidence before it nor the competency to perform such a task. Instead, the court will consider the discounted value of the "job requested" variable in the context of the burden of proof.

his or her career, but that time could not be specifically evaluated. Dr. Welch also used a female interaction term for individuals who had these leading gaps.

The use of the female interaction term is somewhat controversial.[28] Although it is not inherently improper, because of its underlying assumptions, it should be used with circumspection. The term attempts to measure possible differences in men and women where there is a lack of information. Discussing the use of the interaction term in the case of "suspicious leading gaps" will best illustrate the relation of the female interaction term to missing information and certain assumptions about men and women.

In his report of December 16, 1983, Dr. Welch presented a study which related the length of MAT employees prior careers— the period from when education ended and employment with BCBSM began—to starting salary. The study showed that when men and women are hired out of school, with little or no prior career, into MAT positions there is virtually no difference in their respective starting salaries and initial assignments.[29] The study further showed, however, that the longer the prior career, the larger the difference in starting salary between the sexes to the disadvantage of women. Thus, when the sheer length of the potential career (the period between the completion of education and hire by BCBSM) is measured without regard to its quality, women whose prior career has a potential of twenty years receive, on average, substantially less than men with potential prior careers of the same length.

Since there is no sex differential in initial assignments for those who have no prior career, it was legitimate for Dr. Welch to search for other variables which might explain the differences in initial assignment for those with lengthy careers.[30] Dr. Welch presented an additional study which attempted to show that the quality of the prior career had substantial effect on the initial salaries of individuals. The study showed that the greater the length of the potential prior career the greater the differences in initial salaries between men. According to Dr. Welch: "Diversity in pre-BCBSM activities results in increased divergence in starting BCBSM salaries among men with long prior careers relative to men with short (or no) prior careers.... Evidently, how a new employee has spent his prior career affects how much money he receives from BCBSM." Dr. Welch's Report of December 16, 1983, at pages 30 and 32.

Dr. Welch presented a further study, Table 3.4 of the December 16, 1983 Report, which shows the effect of certain career activities on initial salary at hire. The study shows that starting salary differs systematically for persons with different prior careers. The study also showed that individuals with suspicious leading gaps who had all four blanks of the application filled in received wage increases per each year of the gap of 2.1% more than those who did not have suspicious time gaps. Those, however, with suspicious leading gaps who did not fill in all the blanks had the initial salary diminished by 1.0% per each year of the gap. The study is summarized in the following table:

28. Dr. Welch's use of the interaction term in this case is indeed novel, not because it is statistically unsound, but because studies generally do not have the opportunity to evaluate data of this detail. Although the personnel data of BCBSM is not totally complete according to the experts in this case, it contains much more information than statisticians normally have. This has allowed the experts to present a number of studies and implement techniques which, although reasonable statistically, are not found or analyzed in the scholarship in this area. This has forced the court in the evaluation of the interaction term to enter into seemingly uncharted areas.

29. This study was based upon college graduates in business, but is apparently representative of all MAT employees.

30. This study did not attempt to compare qualifications other than the length of the prior career and, thus, by itself is not very probative of discrimination. The reference to the sex differential was not used in the same context as differentials which are the result of regressions which measure productive characteristics.

| Time Spent in . . . | Results in Salary Increase per year |
|---|---|
| Other BCBSM Job (not for BCBSM) | 5.1% |
| Other Job | 4.7% |
| Military | 5.3% |
| Job While in School | 6.3% |
| In School | 6.9% |
| | |
| Leading Gap: | |
| 4 prior jobs placed on application | 2.1% |
| Fewer than 4 jobs | −1.0% |

For these studies, Dr. Welch opined that productive prior experience was greatly valued at BCBSM and that the suspicious leading gap was a period when the individual added to his or her human capital—as the 2.1% figure suggests. Dr. Welch further made the reasonable assumption that the missing information in the suspicious leading gap was actually career information which influenced the employee's placement in BCBSM. Relying on his studies concerning the background of men and women MATs, which conclude that women as a whole come to BCBSM with fewer qualifications,[31] women do not generally, in the human capital sense, have as productive prior careers as do men. Dr. Welch concluded that any residual difference in initial salaries of men and women with long potential prior careers is due to the fact that men spent the period known as the "suspicious leading gap" more productively than women. Dr. Welch uses similar reasoning in implementing the term for blank job requests. Because men brought more skills to BCBSM and because men generally requested higher level professional and managerial positions,[32] according to Dr. Welch, it is likely that a blank job requested had a different meaning for men than for women. Thus, Dr. Welch used a female interaction term to measure the *possibility* of these occurrences. In this way

Dr. Welch attempted to characterize the missing information in terms of time and factors which may have added to the human capital of the individual.

Plaintiffs delineate several problems with the use of the interaction term. Although the interaction term is useful in finding the possibility of differences in prior careers, it may also inadvertently mask discrimination. The interaction term accounts for a certain percentage of the sex differential. Dr. Welch asserts that the term measures real differences in the productive qualifications of men and women. The following example will demonstrate the potential problem with this model. A man and woman are hired at BCBSM with comparable qualifications and each has a suspicious gap of the same length and, although unbeknownst to the statistician, each spent that period performing the same activity. If the woman is placed in a lesser position due to discrimination, Dr. Welch's interaction term could hide this bias. Dr. Welch's regressions also included a variable representing sex alone. It is the coefficient of this variable which is the primary measure of discrimination. However, it is conceivable that the pattern of discrimination was complex and is also reflected or hidden in the coefficient of interaction terms between sex and other variables—e.g., suspicious leading gap.

Second, the interaction term appears to account for too much of the sex differential considering the value of the information it is attempting to reflect. According to plaintiffs' calculations, the interaction term with the "suspicious leading gap" accounts for 1.2% of the sex differential[33] while the interaction term with the blank job request forms accounts for 2.4% of the differential.[34] It does not seem likely, although

---

**31.** *See supra* notes 20–22 and accompanying text.

**32.** *See supra* text at notes 24–25.

**33.** The sex differential with the prior career without the leading gap variable and without the "job request" variable is 7.5%. With the leading gap variable the differential is reduced to 5.9%. Plaintiffs assert that if the leading gap variable is included, but without the interaction term the sex differential is only reduced to 6.3%.

**34.** Dr. Welch reported that the job requested variable reduced the differential from 5.9% to 0.0%. According to Dr. Bergmann's calculations, if the interaction term is not included for the blank job requests there still remains a sex differential of 3.5% to the disadvantage of women.

possible, that this substantial difference in the differential would be caused by the information the interaction term purports to account for. Although productive time in a leading gap is somewhat important, it does not seem reasonable to assume that an employer would place this much weight on this factor in fixing initial salaries. Certainly the employees last four prior jobs should be much more compelling in that determination as is evidenced by the fact that BCBSM requests it. Similarly, although to a lesser extent, it does not appear that the interaction term for blank job requested applications should account for so much.

Dr. Welch also submitted alternative studies which avoid the controversy of the interaction terms and are highly significant and revealing. In these studies he omits the interaction term and the aspect of the variable to which it was related. The first study contains a regression which includes all the variables discussed, but excludes individuals who did not fill in the job requested blank. This study, Table 3.1 of Dr. Welch's Surrebuttal Report, showed a small, statistically insignificant difference in the starting salaries of men and women. A second study, Table 3.2 of Dr. Welch's Surrebuttal Report, omits individuals who have "suspicious leading gaps." The results of this report also show no large or significant difference to the detriment of women. Putting aside the problems with the "job requested" variable, Dr. Welch correctly summarized that "[a]mong persons with complete data, men and women start at BCBSM at comparable salaries." Dr. Welch's Surrebuttal Report, at page 23.

Plaintiffs contend that Dr. Welch should simply have excluded the interaction term in performing these tests and should not exclude the individuals with missing data. Essentially, plaintiffs' argument in this regard requests that the court choose their assumptions over Dr. Welch's but without sufficient evidence to warrant doing so. First, concerning the "suspicious leading gap," plaintiffs assert that since the sex

differential is non-existent for those with no prior career experience and increases as the length in potential prior career experience rises, the reason for:

> a larger disadvantage is because an employee can't [sic] have a leading gap without a fairly long career. In other words, it is necessarily true that employees with leading gaps are more likely to be older and more experienced than those without such 'gaps.'
>
> It is hardly surprising that there is a greater difference among male and female [sic] with a B.A. in Business who have been in the labor market for ten (10) years as opposed to the males and females who have just graduated with a B.A. in Business. The reason is simple.
>
> Women with leading gaps, who suffer discrimination, will be more likely to suffer a larger loss simply because they are the most likely candidates for the higher paying jobs. Not only is this simple fact the most likely explanation for the higher disadvantage for women with leading gaps, but it is the best reason for not omitting such employees from the regression.

Plaintiffs' Post-Trial Brief, at page 33.

Plaintiffs did not present any evidence or studies which support this assumption. They cannot point to any reason which makes their assumption more possible or acceptable than those offered by Dr. Welch. Instead, the court has before it two conflicting assumptions and insufficient information to test the validity of either. Dr. Welch presents studies which tend to support the common belief that men may have spent the time in a suspicious leading gap more productively than women.[35] This court hesitates to adopt that position wholeheartedly because, as previously discussed, in the context of this case it may mask discrimination. On the other hand, plaintiffs request the court to assume the opposite without supporting evidence. Rather than choosing between

---

**35.** In different contexts, courts have accepted the proposition that men generally acquire better productive qualification than women. *See,* *e.g., Valentino v. United States Postal Service,* 674 F.2d 56 (D.C.Cir.1982).

these two possible assumptions, it is more prudent and logical, as Dr. Welch suggested, to simply exclude these individuals from the regression.

The same analysis applied to the individuals with blank job requests. Plaintiffs argue that the court should treat blank job requests as expressing the applicant's desire for any position. Again, plaintiffs offer no evidence to support nor compelling reason to accept this assumption. There are a number of reasons why the job request information was left blank. Since several applications have "anything" written for job request, it can be reasonably assumed that applicants who were interested in any position indicated so and did not leave the job request blank. Further, it may be there was no need for the applicant to indicate the job sought because of the circumstances surrounding the interviewing process. As opposed to plaintiffs' assumption, Dr. Welch presents studies, which although not determinative, do support his assumption that there is a possibility that men and women who left the job requested blank were seeking very different positions, that is, men sought technical or professional positions while women sought clerical positions. Again, rather than attempting to choose between these possible assumptions, the better course is to simply eliminate these people from the regression.

In summary, Dr. Welch's initial assignment study found no sex differential in starting pay wages for men and women. Although most of Dr. Welch's study can be accepted, there exists the problem of the interpretation of the "job requested" variable. Since there is the possibility of "steering" by BCBSM personnel, the court must discount the effect of that variable so that there is some, albeit small, showing of a sex differential to the disadvantage of women. Plaintiffs' concerns about the sex interaction term are adequately satisfied by Dr. Welch's regressions which exclude that information and those individuals affected from the studies and show no statistically significant differential.

### B. *Promotions*

Plaintiffs also allege that women employees were discriminated against in terms of promotions within the MAT ranks. Plaintiffs concede that there is no statistical showing that women were overall less likely to receive promotions. Both Dr. Bergmann and Dr. Welch agree that, overall, women are actually promoted at higher rates than men. Further, plaintiffs admit that, overall, women MATs receive higher salary increases than men. Plaintiffs claim that discrimination in the promotion of women does not occur, overall, in MAT ranks but only in the higher levels. The levels of MAT positions range generally from exempt 1 through exempt 9.[36] Dr. Bergmann presented several studies which were intended to show that women were victims of discrimination in moving into the higher MAT ranks. Her studies focused upon promotions into exempt 7 and above. Although Dr. Bergmann's studies were seriously flawed and basically unusable, plaintiffs have maintained their claim that women were discriminated against in this fashion. Rather than relying upon Dr. Bergmann's studies, plaintiffs attempt to show discrimination by arguing that the regressions of Dr. Welch should be modified in a manner which would result in sex differentials to the disadvantage of women.

Dr. Welch presented several studies which indicated that women were not discriminated against in either overall MAT promotions nor in promotions into exempt 7 and above. *See* Dr. Welch's December 16, 1983 Report, at pages 54–60. Among these studies was an analysis of the percentage of the exempt 7 and above positions which were occupied by women. This study indicated that the participation of women into these ranks doubled in the period of 1976 (12.6%) to 1982 (26.4%).[37] Another study submitted by Dr. Welch showed that the percentage of women in exempt 7 and above was, overall, equal to or higher than the percentage of qualified available wom-

---

**36.** *See supra* note 8.

**37.** This report is summarized in Table 6.1 of Dr. Welch's December 16, 1983 Report.

en in Michigan.[38] Finally, Dr. Welch presented a regression which purported to measure the promotion rate of comparably qualified men and women into grades exempt 7 and above and which showed no significant sex differential.[39]

Plaintiffs contend that two of the variables Dr. Welch used in this latter regression were improper. The independent variables included tenure at BCBSM, education, grade, "computer relatedness" (if the individual was in an area related to computers), and positions in various divisions of BCBSM. In their post-trial brief, plaintiffs objected to the use of the grade and division variables. Plaintiffs, however, failed to offer substantive evidence or cogent reasons to warrant the exclusion of these variables.

The grade variable controls for the grade of individuals and their chances of promotion into exempt 7 and above. This variable reflects the reasonable assumption that individuals, male or female, in exempt 5 and 6 have greater opportunity for being promoted in exempt 7 and above than individuals in lower MAT positions. This assumption appears to reflect the actual practices at BCBSM. Both Dr. Bergmann and Dr. Welch presented studies which indicated that promotions for exempt 7 and above generally come from the next lowest grades and rarely come from lower MAT levels. Plaintiffs do not dispute that midrange MAT grade employees were promoted much more readily than low level MAT grade employees. In fact, courts which have considered this issue have rejected regressions measuring promotions which have not controlled for grade under similar circumstances. *E.g., E.E.O.C. v. Federal Reserve Bank of Richmond*, 698 F.2d 633, 658 (4th Cir.1983). *See Valentino v. United States Postal Service*, 674 F.2d 56 (D.C.

Cir.1982). Moreover, Dr. Welch presented a study in his surrebuttal report which measured the difference in promotion rates by grade between men and women—after controlling for productivity-related factors, but without controlling for division or whether the employee holds a computer related job—and found that men and women were promoted at the same rate within each grade over the liability period.[40] In other words, there is no disparity in the movement for men and women from grade to grade.

Without the grade variable the regression would assume that all individuals are equally likely to be promoted into exempt 7 or above, every year, regardless of their grade. Since women hold a greater percentage of the lower MAT positions,[41] it is certain that such a regression would indicate a sex differential to the disadvantage of women because of the chances of promotion from the lower exempt positions into exempt 7 are not as great as from the middle level exempt positions.

The "division" variable purports to control for the effect of employment in a certain division of BCBSM on chances of promotion into exempt 7 and above. Dr. Welch included this variable because his studies indicated that individuals, male or female, in some divisions had greater opportunity for promotion into high level MAT ranks. In his report of November 7, 1983, Dr. Welch presented a study which showed that persons in the Marketing and Data Services Divisions generally received more promotions than other employees. BCBSM is organized into twenty divisions. Dr. Welch's study presents the average annual promotion and salary growth rates during the period of 1976 to 1982, for the six largest divisions, separately with the remaining 14 divisions combined. The following table summarizes that report:

**38.** This report is summarized in Table 6.2 of Dr. Welch's December 16, 1983 Report.

**39.** This report is summarized in Table 6.3 of Dr. Welch's December 16, 1983 Report.

**40.** This study analyzed non-exempt positions 8 through 15 and exempt positions 1 through 9. The study shows four grades where differentials

are statistically significant, but two favor women. Dr. Welch correctly concludes that based upon the data in this study: "[t]here is no readily discernible pattern to the advantage of either sex." Dr. Welch's Surrebuttal Report, at page 33.

**41.** Dr. Welch's Report of November 7, 1983, at page 7. *See supra* text at notes 21–22.

| Division | Percent Promoted |
|---|---|
| Membership and Regular Business Claims | 17.9% |
| Government Business | 17.7% |
| Marketing | 21.2% |
| Auto and National Marketing | 15.5% |
| Health Care Affairs | 13.5% |
| Data Services | 21.6% |
| Others | 14.4% |

Significantly, Dr. Welch submitted another study in his report of November 7, 1983, which showed that women were promoted at the same rate as men within divisions.[42] Hence, although employees' chances for promotion depend on which division they were in, there is no showing of disparity of treatment between men and women within divisions.

Plaintiffs' arguments for excluding these variables are without merit. As for the division variable plaintiffs contend: "Division proves nothing. It is a clearly inappropriate variable. Using Division as an explanatory factor begs the question. If Division is a better career path why aren't more women in Division A." Plaintiffs' Post-Trial Brief, at page 39. Concerning the grade variable, plaintiffs make a similar argument:

... if grade assignments are fair, they can be used to supplement the information we already have relative to the employees' qualifications by telling us something about how otherwise equally qualified employees distinguished themselves on the job. The problem is that based upon this record we cannot assume nondiscriminatory initial placement and/or advancement from below.

Plaintiffs' Post-Trial Brief, at page 42. These statements merely reflect plaintiffs' conclusions and have no support in the record nor in reason. It is plaintiffs who beg the question with these arguments.

Plaintiffs' contentions here are not the same as their arguments concerning the sex interaction term. Unlike the underlying assumtions of the sex interaction term, these variables do not assume that women possess less productive qualifications than men. The theory and implementation of these variables are completely neutral as to sex. The studies by Dr. Welch, which plaintiffs do not challenge or question, show that women and men were promoted equally from grade to grade and within divisions. Plaintiffs' assertions are nothing more than claims that the vestiges of past discrimination are pervasive, that women were not initially placed into the MAT grades which would allow them to be promoted into the upper MAT ranks. The plaintiffs did not and cannot point to any study or analysis which would suggest that the grade or division variables bias Dr. Welch's regressions. Nor, more importantly, do they show in any way that women were discriminated against in terms of promotion at any level at any time. Plaintiffs cannot properly rely upon this vestige of past discrimination argument *without showing the past discrimination.*

The circumstances of this case are not akin to those faced by the court in *Segar v Smith,* 738 F.2d 1249 (D.C.Cir.1984). In *Segar,* the plaintiffs were black Drug Enforcement Agents who claimed discriminatory treatment in initial job assignments and promotions. Similar to the argument pressed here, the *Segar* plaintiffs claimed that they were unable to move to the upper level grades of the government's grade system. They argued that blacks received less opportunity to advance above grade GS–12. The *Segar* plaintiffs' statistical evidence, however, did not show discrimination in promotions above grade GS–12. Nonetheless, the circuit court upheld the district court's findings of discrimination in promotion because plaintiffs proved "discrimination in the factors that bear most strongly on promotion." *Id.* at 1283. The court found it significant that the plaintiffs "made a prima facie showing of discrimination in initial assignments, supervisory evaluations, and discipline. These are precisely the factors that determine a special agent's prospects for discretionary promotions at higher levels of DEA." *Id.* The plaintiffs in this case have not shown discrimination concerning the factors bear-

**42.** See Table 4.4 in Dr. Welch's report of November 7, 1983.

ing upon promotion. They have not shown that women were discriminatorily kept from mid-range MAT positions or from divisions which exhibited the highest promotion rates.[43]

Thus, plaintiffs have failed to establish that Dr. Welch's findings of no disparate treatment in promotions are unjustified.

## IV. CONCLUSION

Pursuant to the consent decree the court is to determine the range of damages, from a low of $1.5 million to a high of $4.5 million, based upon the "strength" of plaintiffs' case which, in turn, was to be primarily based upon statistical evidence. As provided in the decree, the court is to award plaintiffs upon a "weak" showing of discrimination the minimum of $1.5 million—if "the plaintiffs fail to meet their required burden of proof of showing class-wide discrimination, whether defined as a prima facie case, or on the basis of the statistical presentation ..." [44]—and upon a "strong" showing an award of $4.5 million. A showing between "weak" or "strong" would mandate a figure between $1.5 and $4.5 million as the court deemed appropriate based upon the strength of the evidence. Based upon these guidelines, the court must award $1.5 million because plaintiffs' showing of discrimination has not been compelling.

The plaintiffs did not present a statistically reliable study or analysis which indicated discriminatory conduct by defendant. In fact—perhaps as a realization of the shortcomings of their own studies—plaintiffs attempted to prove their case by arguing variations upon the studies presented by defendant. These arguments, with one exception, were likewise unavailing. This exception is the problem of the reliability of the "job requested" variable due to steering. Because of this problem there does appear to be a showing, although small, of discrimination in initial assignment since this variable cannot be fully relied upon to explain 5.9% of the sex differential. However, since this showing is based upon the *possibility* of unreliability and not on an actual showing, this factor cannot be given too much weight.[45] Moreover, the initial assignment issue only involves about a third of the MAT women employees since two-thirds entered from non-MAT ranks and in the promotion area a relatively small number of women were affected. Hence, class-wide discrimination was not established.

Therefore, since plaintiffs' statistical case was entirely based upon the studies presented by defendant, since the only possible showing of discrimination concerns initial assignments into MAT levels which concerns only one-third of the class, and

**43.** The parties spent much time considering studies of Dr. Welch and Dr. Killingsworth who performed regressions which did not control for division. The results of these studies showed a minor sex differential to the disadvantage of women. Since the division variable is a proper and reliable variable, there is no need for the court to pass upon the importance of these studies.

It should be noted, however, that it is not surprising that a sex differential would be found when division is not taken into account. It is likely that men predominate in the divisions which have the highest promotion rates—not as a result of discrimination, but because of their backgrounds and qualifications. Nearly twice as many men MATs than women MATs have backgrounds and education in the computer-math-actuarial sciences. Dr. Welch's Report of November 7, 1983, at page 7. *See supra* notes 20–21 and accompanying text. Divisions such as Data Services and other computer related

divisions which have the highest promotion rates are more likely composed of men. It should be remembered that this high promotion rate is not traceable to discrimination because women with comparable qualifications were promoted at the same rate as men. *See* Table 4.4 in Dr. Welch's report of November 7, 1983. There simply were more men in those divisions, due—as far as the evidence shows—to reasons other than sexual bias.

**44.** Consent Judgment, at page 7.

**45.** Because of the constraint of the consent decree that only statistical evidence can be considered, the court is limited to considering the reasonableness of certain assumptions and their possible impact upon the figures. The steering question is certainly a concern; however, there has been no proof of this actually occurring. Hence the court is limited to considering *possibilities* and must appropriately weigh those more shallow inferences with established facts.

since this showing is only based upon the possibility of the unreliability of the "job requested" variable, the court must conclude that the plaintiffs have presented a "weak" case which, thus, entitles them to the minimum amount provided in the Consent Decree.

The parties are directed to submit an order in accordance with the foregoing and providing for the implementation thereof.

IT IS SO ORDERED.

## APPENDIX A

### MEMORANDUM OPINION AND ORDER APPROVING CONSENT JUDGMENT

After nine years of preparation, discovery and trial postponements, the parties in this lawsuit have submitted a consent judgment. The agreement was reached before the third day of trial commenced. Pursuant to the procedures established in *Stotts v. Memphis Fire Department,* 679 F.2d 541 (6th Cir.1982), *cert. granted,* 462 U.S. 1105, 103 S.Ct. 2451, 77 L.Ed.2d 1331 (1983) and *Williams v. Vukovich,* 720 F.2d 909 (6th Cir.1983), this Court preliminarily approved the compromise, after determining that it was not illegal or tainted with collusion, and suspended the trial. Notice was then given to all class members, by mail and by newspaper publication, which explained the proposed consent judgment, how class members' rights would be affected, and of the opportunity to raise objections. Two hearings [1] were held by the Court for class members to voice their disapproval. Only one class member raised an objection, but she later withdrew it.[2] The Court orally ruled on the record that the settlement was fair, adequate, and reasonable, and stated that it would issue an opinion detailing its ruling. The Court's reasoning is contained in this Memorandum Opinion.

The complaints [3] in this case were filed in 1975 and, having been modified, embody claims of sex-based employment discrimination on the part of defendant Michigan Blue Cross/Blue Shield ("MBCBS") in violation of Title VII, 42 U.S.C. § 2000e–2. The plaintiff class, as certified, is comprised of all past, present, and future women employees of MBCBS who have held positions in the management ranks.[4] Presently the class consists of approximately 4,300 women. Plaintiffs claim that women in management positions have been victims of intentional discrimination or disparate treatment regarding initial assignment, promotions, and classifications of certain jobs. The issue of gender-based discrimination is not a simple one. The complexity in this case is augmented by the size of the class, the extended period of inquiry (from 1972 to the present) and the myriad of delineated career positions in this health care organization. Not surprisingly, the trial on this matter was estimated to consume not less than twelve weeks. But, as mentioned, the parties entered into a settlement after two days of trial.

The consent judgment is unusual in that it does not completely resolve the case so that no trial on the merits is necessary, but rather narrows the issues to be decided by the Court at trial. The consent judgment contemplates both equitable relief and monetary damages.

First, as to the equitable relief. Many of the MBCBS practices that plaintiffs found objectionable in 1975 have been modified. The Corporation now posts or places no-

1. Two hearings were held because the sole objector, Ms. Kathleen C. Doelle, could not attend the first hearing. A second hearing was held so that she could voice her objection orally on the record.

2. Ms. Doelle withdrew her objection after she learned that the Court could not by itself modify the consent judgment, but that it would require the agreement of the parties to extend the conditions and terms of the decree.

3. The instant case's present form is the result of the consolidation of two cases both filed in 1975 against MBCBS, *Dalley v. MBCBS,* No. 75–71244 and *Mullican v. MBCBS,* No. 75–70510.

4. Prior to 1980 MBCBS labeled the management positions in question as MAT ("Managerial, Administrative, and Technical") jobs. Since 1980, these positions have been generally relabeled as "exempt". The plaintiff class has been certified to consist of those "MAT" or "exempt" women employees where the two concepts overlap.

tices on the availability of a larger number of management positions. It also has implemented certain procedures to ensure that positions which the Equal Employment Opportunity Commission's representative has determined as "underutilized", (i.e., a proportionately small percentage of women now fill those jobs) would be first filled by women if they are qualified. The injunctive relief provided in the settlement requires continuance of current practices and also concerns upper-level management positions, grades 9 and 10, where MBCBS had resisted posting procedures. The judgment provides an alternative method to posting as to the higher positions and affirms that the corporation will use its best efforts to fill "underutilized" positions with qualified women. MBCBS is to provide every exempt female employee at their performance review:

> a form which, when executed, will indicate her desire to be considered for promotion to the higher manager-level or grade 9 and 10 positions which are not posted. She will further indicate on this form the particular manager level or grade 9 and 10 positions for which she is specifically interested. This record will be retained in the staffing area of Human Resources until the date of her next scheduled performance review. It will be withdrawn from the file in Human Resources at that time, unless the employee chooses to submit a current form on the date of the subsequent performance review. BCBSM has agreed that for four years from the date of the entry of the Order of the Court in this matter this procedure will be in place for all exempt female employees.

Consent Judgment, page 3. The judgment further provides that during the life of the form it will serve as the applicant's permanent application for all female "underutilized" upper-level management positions. In addition, a female employee may bid for all posted positions regardless of level. The Human Resources staffing area is to continue to receive job vacancies for unposted grade 9 and 10 positions which are underutilized when the position cannot be filled with a qualified female within the line

area Human Resources will then consider all qualified females who have executed the form requesting that they be considered for such a position. The best qualified female candidate will be selected pursuant to current company policies. All qualified women who were not given the position will be given reasons why they were not selected. Further, a book or record containing descriptions of all manager-level and grade 9 and 10 jobs which are not posted is to be available for inspection in the Human Resources area for employees who have indicated they seek advancement to any of those positions.

To ensure the integrity of these procedures, plaintiffs' head counsel, Ronald Reosti, will for four years be provided by MBCBS on an annual basis "reasonable access and inspection of the forms women have executed indicating their desire to be promoted to nonposted 9 and 10 positions and manager level positions." Further, "[MBCBS will provide] ... reports which indicate which of these females were selected or rejected candidates, and any subsequent record activity relative to that placement ..." Consent Judgment, page 4. MBCBS is to also provide Reosti with a summary report showing all male and female placements in exempt jobs grades 6 through 11. If the position was characterized as "underutilized", the report is to indicate the gender of the person filling the position.

The Corporation is to implement two more procedures which are designed to overcome alleged discriminatory obstacles. First, the Company will review its manager level job descriptions and use its best efforts to include experiential equivalents for college degrees wherever appropriate. This is in response to plaintiffs' allegation that MBCBS supervisors included a college degree requirement when not necessitated by the job in order to exclude women candidates. Second, in response to the allegation that management training programs favored male employees, the judgment requires that MBCBS establish training programs for all pre-management level employees for the years 1985 and 1986.

These programs will be funded by an amount of money equal to five percent of any monetary award. One-half of the amount will be paid by MBCBS while the other half will be paid from the award.

The issue of a monetary award has been hotly disputed. The disagreement does not arise simply from the relative merits with which each party perceives the case, but also from the size of the class and the variety and number of the positions involved. In an effort to compromise, the parties have agreed to a floor and ceiling regarding an award of 1.5 million and 4.5 million, respectively. These figures represent the minimum and maximum of a linear range of awardable damages. The exact figure is to be established by the Court after a trial on the merits. Under the proposed judgment, trial will be limited to the submission of statistical evidence. At the conclusion of this presentation and any rebuttal the parties deem necessary, the Court will fix damages on the "strength" of plaintiffs' statistical case. Thus, if plaintiffs make no showing of discrimination with the statistical evidence or if that showing is very weak, then plaintiffs will only be entitled to 1.5 million. Conversely, if the plaintiffs' case is very "strong", then the Court will award 4.5 million. In the event plaintiffs' statistical case is neither "weak" nor "strong" but falls somewhere in between, then the Court will assess the award appropriately between 1.5 and 4.5 million. Moreover, whatever plaintiffs' recovery, the decree provides for the payment by defendant of reasonable fees and costs incurred by plaintiffs, thereby protecting the fiscal integrity of the award.

■ Rule 23(e) of the Federal Rules of Civil Procedure provides that this Court must independently approve a settlement in a class action suit. Although the "law generally favors and encourages the settlement of class actions", *Williams v. Vukovich, supra,* 720 F.2d at 923; *Franks v. Kroger Co.,* 649 F.2d 1216, 1224 (6th Cir. 1981), this Court can only approve a settlement if it is "fair and reasonable to those it affects." *Williams v. Vukovich, supra,* at 921; *Stotts v. Memphis Fire Department, supra,* 679 F.2d at 552. In *Williams* the Sixth Circuit held: "In making the reasonableness determination the court is under the mandatory duty to consider the fairness of the decree to those affected, the adequacy of the settlement to the class, and the public interest." 720 F.2d at 921. Previously, in *Stotts* the Sixth Circuit stated the applicable standard to be:

In making the reasonableness determination, the court is under a duty to evaluate three factors. First, the court must consider whether the decree is a fair and adequate resolution of the allegations contained in the complaint.... Ordinarily, the following factors will be considered: 1) the complexity, expense and likely duration of the litigation; 2) the state of the proceedings and the amount of discovery completed; 3) the risks of litigation; 4) the resources of the defendant; and 5) the reasonableness of the settlement in light of the best possible recovery....

Second, the court must consider whether the decree is fair and reasonable to nonminorities who may be affected by it....

\* \* \* \* \* \*

The final factor a court must consider is all objections to the decree and alternatives to the decree's provisions presented during the hearing....

679 F.2d at 552–54.

■ First, as to the reasonableness and adequacy of the decree, several reasons counsel in favor of approval. The equitable relief adequately remedies the discriminatory practices plaintiffs asserted were most oppressive. Briefly, when this case was initiated, MBCBS hiring and promoting practices in the management ranks were subject to the criticism of male selectivity and lack of notice. Thus, plaintiffs could allege that job openings in the management ranks were rarely posted, job requirements were left to subjective opinions of supervisors, and there was no program for seeking out qualified women to fill "underutilized" jobs. MBCBS has eliminated much of these alleged "ills" in the management positions below grade 9, by

posting job vacancies, establishing, as far as possible, objective job descriptions, and implementing an affirmative program to place females in "underutilized" positions. MBCBS has been reluctant to establish the same procedures for those positions above grade 8, presumably because those jobs involve qualities that are difficult to define and by their nature require subjective judgments. The equitable relief in the settlement provides a compromise which protects the interests of both sides. The self nominating system along with the program to ensure that "underutilized" positions are filled by qualified women, should minimize, if not eliminate, any previous discriminatory practices and provide a better opportunity for women to advance to upper-level management jobs.

While there was some concern that the consent judgment did not address the highest level management positions, i.e., grade 12 and above, that concern was ameliorated because it appears that having achieved a grade 10 or 11, openings for higher positions would be readily ascertainable in view of the small number of such positions. Further, considering that the attempt here is to compromise, any sacrifice of this issue must be considered prudent due to the small proportion of class members that would be affected thereby. Finally, by having achieved a grade 10 or 11 position, women will have established their merit and should be able to compete on equal terms with men.

In sum, the proposed equitable remedies, coupled with changes already made by defendant, meet fairly and adequately the claims of the plaintiffs and give assurance that defendant's future practices and policies will effectuate the goal of equal employment opportunities.

In the absence of a settlement, this case would have taken on a different dimension—trial of the liability issues. In assessing the adequacy and fairness of the monetary award that dimension cannot be ignored. As alluded to earlier, the case would be protracted and complex. Individual claims of alleged discriminatory conduct would need to be aired. To establish such claims, and to rebut them, would engage over a hundred witnesses and numberless exhibits. This anecdotal testimony alone would have consumed many weeks of trial. The significant ramification in this process is that there is no assurance that the plaintiffs would be successful in satisfying their burden of proof as to liability. *See e.g. International Brotherhood of Teamsters v. U.S.*, 431 U.S. 324, 325, 336, 97 S.Ct. 1843, 1849, 1855, 52 L.Ed.2d 396 (1977); *Grano v. Dept. of Development of City of Columbus*, 637 F.2d 1073 (6th Cir. 1980). Nor, on the other hand, is there any assurance the defendant could defend its position successfully. Rather than risk the all or nothing result dictated by our juridical system, the parties, in recognition, among other things, of the strengths and weaknesses of their respective cases, commendably decided to attempt a fair resolution aimed at avoiding a draconian result and acrimonious effects. Thus, it was initially agreed that without admitting liability, MBCBS would pay to the class a minimum of 1.5 million dollars plus reasonable fees and costs. As a quid pro quo, the plaintiffs agreed to a maximum award of 4.5 million dollars. The actual and final award would be left for the determination of the Court between those two amounts after hearing statistical evidence. Trial was thus shortened to approximately one week.

The settlement not only resolved major issues of liability but also had a significant impact on the damage issue had a trial been required. Each separate claim would have had involved its own minitrial. For example, if liability was established, should a promotion been from grade 9 to grade 10 or to grade 12, when should it have been made; what was the pay differential, etc.

Considering the risks of prevailing, the complexity and variety of the issues, the absence of objections from class members, the guarantee of a sizeable recovery by the class and the recommendations of counsel, the monetary award is adequate and reasonable. *Williams v. Vukovich, supra,* 720 F.2d at 923; *Stotts v. Memphis Fire Department,* 679 F.2d at 554–55; *In re Chicken Antitrust Litigation American*

*Poultry,* 669 F.2d 228 (5th Cir.1982); *In re Corrugated Container Antitrust Litigation,* 643 F.2d 195 (5th Cir.1981); *Guthrie v. Evans,* 93 F.R.D. 390 (S.D.Ga.1981); *Alliance to End Repression v. City of Chicago,* 91 F.R.D. 182 (N.D.Ill.1981).

The Court has heretofore found that there was no collusion between the parties and affirms that finding at this time. The case has been hard fought and the settlement hammered out after extensive and shrewd negotiations. This Court has presided over many hearings and pre-trial conferences and was privy to some of the settlement negotiations. It is satisfied from the record itself and from those experiences that there was no overt or tacit understanding between the parties or counsel to enter into anything but an equitable compromise. Events since the submission of the proposed consent judgment also attest to a lack of collusion. Most importantly, the evident fairness of the settlement itself speaks to professional and ethical conduct by the participants.

The *Stotts* court also directs that "the court must consider whether the decree is fair and reasonable to non-minorities [males] who may be affected by it." 679 F.2d at 552. The equitable relief in the settlement establishes procedures to ensure that qualified women are placed in *"underutilized"* upper-level management positions. The procedures are designed to fill jobs which are currently filled by a smaller percentage of women than the EEOC representative has determined should be. Once those benchmarks are met, the affirmative procedures will be unnecessary and all employees will be able to compete equally without regard to gender. Importantly, only qualified women are to be selected for these positions. This is not a situation where a protected class member receives a position despite inadequacies in her qualifications over a man with superior credentials. Furthermore, the terms of the equitable relief conform with the requirements of temporalness and remedying statistical disparity asserted in *Williams v. Vukovich, supra,* 720 F.2d at 922. In short, any unfairness to males is fleeting and minimal.

The *Stotts* court also held that the Court should consider the objections, if any, presented by class members. 679 F.2d at 554. Although the absence of any objections should not be conclusive, it is instructive regarding the fairness of the settlement. The class consists of highly educated and intelligent women. Notice to the class not only included an explanation of the decree, but also a copy of the settlement along with a claim form for class members to indicate the discriminatory practice they felt they suffered, in order to obtain a monetary award. Thus, since the class members were well informed a substantial possibility exists that if the decree was actually unfair or inadequate someone among the class members would have raised an objection. *See Ohio Public Interest Campaign v. Fisher Foods, Inc.,* 546 F.Supp. 1, 11 (N.D.Ohio 1982).

Finally, the *Williams* court stated that the public interest must be considered in determining whether a class action settlement should be approved. 720 F.2d at 923. As the court asserted: "Voluntary compliance will frequently contribute to the ultimate achievement of the public objectives [embodied in Title VII]. Consent decrees minimize the delay, expense, psychological bitterness, and adverse publicity which frequently accompanies adjudicated guilt." *Id.* Although a trial to determine the monetary award will still be held in this case, all of the equitable relief was agreed upon. The spirit of cooperation and compromise evidenced by the efforts of MBCBS and the plaintiffs bodes well for the continuation of a relationship between employee and employer that should be of benefit to both and will undoubtedly further the public interest in equal employment opportunities.

Therefore, for these reasons the Court finds the consent decree fair, adequate and reasonable, and approves the consent judgment.

IT IS SO ORDERED.

/s/ Philip Pratt
PHILIP PRATT
United States District Judge

Dated: April 6, 1984
Detroit, Michigan

## APPENDIX B

### CONSENT JUDGMENT

At a session of said Court, held in the Federal Building, Detroit, Michigan on Mar 26, 1984.

PRESENT: HON. PHILIP PRATT, U.S. District Judge.

The Court having been advised by counsel for the parties on December 19, 1983 that a tentative settlement had been reached between the parties; the Court having met with counsel for the parties on that date and having been advised of and considered the parameters of the tentative settlement; subsequent thereto plaintiffs having filed a motion for preliminary approval of a proposed Consent Judgment incorporating the terms of the settlement and the Court having met with the parties' counsel on December 29, 1983, to review a proposed Notice to the class which the Court approved; the Notice having been sent to the class members with a Court approved claims form and notice having also been given by Court approved newspaper publication; the Court having set February 22, 1984 as the date for hearing on any objections to the proposed settlement on which date, in open Court, the Court was prepared to entertain objections to the proposed settlement and this judgment;

One objection having been filed, the objector requesting an adjournment as to her objection, which adjournment was granted to March 19, 1984, on which date the one objector appeared to voice her objections, withdrawing same on March 21, 1984;

And after due consideration of the foregoing and being otherwise fully advised in the premises, the Court having concluded that the settlement, as incorporated in this Consent Judgment, was the result of extended and arms length bargaining between experienced counsel representing the parties; that the terms of the settlement resulting from that bargaining process are deemed by the Court to be fair under all the circumstances, in the interests of the class affected thereby, and comport in all respects with the requirements of FRCP 23;

IT IS HEREBY ORDERED that the following Consent Judgment be, and the same hereby is, entered:

### I

### AFFIRMATIVE AND EQUITABLE RELIEF

#### A. PROMOTIONS

1. Blue Cross Blue Shield of Michigan (BCBSM) will, at every exempt female employee's performance review, provide her with a form which, when executed, will indicate her desire to be considered for promotion to the higher manager-level or grade 9 and 10 positions which are not posted. She will further indicate on this form the particular manager level or grade 9 and 10 positions for which she is specifically interested. This record will be retained in the staffing area of Human Resources until the date of her next scheduled performance review. It will be withdrawn from the file in Human Resources at that time, unless the employee chooses to submit a current form on the date of the subsequent performance review. BCBSM has agreed that for four years from the date of the entry of the Order of the Court in this matter this procedure will be in place for all exempt female employees.

2. During the life of this form, it will serve as the applicant's permanent application for all female underutilized jobs as described in Section 1 above, which are not filled within the line area, for which she is qualified and has indicated her specific interest.

3. This procedure does not preclude any female employee from bidding or being considered, according to normal procedure, for all posted positions regardless of level.

4. According to current standard procedures, when an underutilized position for females in an unposted manager level or unposted Grade 9 or 10 job is not filled within the line area by a qualified PGM, this job vacancy will be returned to the staffing area in Human Resources for their

action using current standards for placement.

5. The Human Resources staffing area will consider all qualified females who have executed the form requesting that they be considered for such position.

6. The best qualified of these individuals will be screened by staffing and line supervision, and a candidate will be selected in line with current policy.

7. In the event there is no request form from a qualified person on file, normal procedures for handling such occurrences in Human Resources will be followed.

8. All qualified persons who were considered for the position will be given the reason(s) why they were not selected. Persons who did not meet qualification requirements will also be notified as to why they were not selected.

9. A book or appropriate record containing the descriptions of all manager level and grade 9 and 10 jobs which are not posted will be available for inspection by employees who have indicated they seek advancement to any of those positions. The book will be available during regular business hours in the Human Resources area.

10. Disputes which may arise over the selection of candidates will be resolved by normal internal complaint procedures.

11. BCBSM will provide to Ronald Reosti, counsel for plaintiffs, on an annual basis commencing one year from the entry of the Order by the Court in this matter, and continuing for a period of four years thereafter, reasonable access and inspection of the forms women have executed indicating their desire to be promoted to non-posted 9 and 10 positions and manager level positions. Further, Mr. Reosti will on those four occasions be provided access to records which indicate which of these females were selected or rejected candidates, and any subsequent record activity relative to that placement initiated by the rejected candidates.

12. BCBSM through its office of Human Resources, will provide for a period of four years on the date corresponding to the date of Mr. Reosti's inspection, a summary report for him indicating all male and female placements in exempt job grades 6 through 11. To the extent those positions have been characterized as underutilized for females by the Company and have been filled, the gender of the person filling that position will be identified.

13. BCBSM agrees to pay Mr. Reosti professional fees at the rate of $125.00 per hour, but not to exceed $2,500.00 in any given year to review the material identified in sections 11 and 12 above.

### B. JOB DESCRIPTIONS

14. The Company will review its manager level job descriptions and make its best efforts to include experiential equivalents for college degrees wherever appropriate.

### C. TRAINING

15. Training programs for pre-management level employees will be established during the years 1985 and 1986. These programs will be funded by an amount of money equal to five (5%) percent of any monetary award ordered by the Court. One-half (½) of said amount will be paid by BCBSM, the other one-half (½) will be paid out of the Award, see *infra*. (It is understood that these new programs are open to all qualified employees regardless of gender or any other factors).

16. These programs, which will be of professional quality, are to be selected by the Company using internal or external programs as appropriate. Employees will be selected on the basis of their qualifications, the relevance of the particular program for their career plans, and with the reasonable concerns of their regular job considered.

## II

### MONETARY AWARD

#### A. LIABILITY RANGE

17. There is hereby established a range of between 1.5 and 4.5 million dollars. The Court, in making its eventual award, may

not go above or below these figures. The Court will determine where, within this range, the defendant's dollar liability will be placed and that determination will be the extent of defendant's monetary liability, except insofar as it is expressly otherwise indicated herein.

18. By agreeing to a range with a minimum dollar responsibility, or by agreeing to the entry of this Consent Judgment, BCBSM has not, and is not deemed to have admitted that it has discriminated in any respect or that it would have been found liable for discrimination after a full trial on the merits.

## B. THE EVIDENCE TO BE CONSIDERED BY THE COURT IN DETERMINING THE MONETARY AWARD

19. A hearing will hereafter be held to determine the monetary award within the range established above. At that hearing, statistical evidence and factual background evidence which is essential and directly related to statistics is to be the only evidence introduced. One of the material considerations towards agreement by the parties to this procedure is the avoidance of any anecdotal testimony as to alleged wrongful conduct on the part of the defendant. Only general foundational evidence with respect to the defendant's policies in general will be introduced to the extent it is essential and directly relates to the statistical evidence.

20. However, the record made in open Court on Thursday, December 15 and Friday, December 16 is to provide a part of the foundational evidence contemplated by the parties and may be considered in its entirety. In addition to the exhibits already introduced, the defendant will introduce the job descriptions of MAT jobs, certain salary administration materials, including "Hay" materials and factual collections made especially for statistical analysis purposes such as the initial job assignment analysis and the breakdown of prior education and experience etc. and job groupings and categories which are now part of defendant's data base.

21. Plaintiffs' foundational evidence, in addition to that introduced at the trial days of Thursday and Friday, December 15 and 16 may consist of the testimony of Lester McBride, Terry Rotare, and Gerald Cole and possibly Fred Nikula. The plaintiffs' foundational evidence will be limited to these submissions and plaintiffs may introduce the testimony of the above referenced witnesses by calling them to the stand or introducing all or part of their depositions taken, assuming a proper foundation is laid.

22. Defendant, on the other hand, may call these witnesses whether or not plaintiffs introduce their testimony (whether by deposition transcript or in person) and may call such other rebuttal witnesses as defendant deems necessary to place in perspective the testimony given by these witnesses or others who have already testified.

23. There is to be no anecdotal testimony by any claimant or other witness intended to show that BCBSM does or does not discriminate across the board or in particular instances, or that any particular policy tends or does not tend to be discriminatory or is applied in a discriminatory fashion, beyond what was introduced into the record on December 15 and 16.

## C. THE STANDARDS BY WHICH LIABILITY WITHIN THE RANGE OUTLINED ABOVE IS TO BE DETERMINED

In determining where to place the damages, if any, within the prescribed range, the following guidelines shall be utilized by the Court:

24. If no "case" is made out by the evidence, (i.e. if plaintiffs fail to meet their required burden of proof of showing class wide discrimination, whether defined as a *prima facie* case, or on the basis of the statistical presentation), or if the "case" is very weak, then the Court must limit its award to 1.5 million dollars.

25. If a "case" is made out by the statistics and that case is very strong, then the Court must award 4.5 million dollars.

The range in between these two figures is to be utilized by the Court to evaluate, in linear fashion, the strength of plaintiffs' case from the weak or non-existent to the very strong.

26. In determining whether a "case" has been made out, or to what degree a case has been made out, the Court should take into consideration the totality of all evidence before the Court at the conclusion of the statistical presentation which is within the guidelines set above.

27. The Court is not to be governed solely by a statistical dollar analysis which may show dollar differentials in excess of the maximum of the range. Such showings are only intended to be evidence of the strength (or lack of strength) of the overall case and are not intended to have a dollar for dollar relationship to the amount of the award. On the other hand, the parties contemplate that the Court will take into account the period of time, if any, during which the Court concludes the plaintiffs have shown the existence of a "case" of discrimination, the nature of the discrimination, together with the strength of that showing.

28. The case on which plaintiffs have the burden of proof is the litigation currently before the Court as defined by the Court's previous orders. Thus, the Court's orders dated April 15, 1983 and December 15, 1983 determining that initial assignment to clerical positions and salary administration matters are not a part of the class certification continue to define the scope of this case. In spite of the fact that by agreement of the parties this Consent Judgment disposes of all the issues excluded by the Court's orders dated April 15, 1983 and December 15, 1983, the Court may not impose any liability, or govern its award, based on a finding of discrimination with respect to such excluded issues.

29. Plaintiffs, on the other hand, may introduce evidence that involves issues excluded from class certification, including that which is covered by the state action, in an effort to demonstrate a tendency on the part of the defendant to discriminate (as opposed to liability on account of this particular type of alleged discrimination),* or as it might otherwise be relevant.

## D. THE STATISTICAL PRESENTATION

30. Statistical evidence will be introduced during the hearing. Each party will rely on one statistician to support that party's affirmative statistical case. Plaintiffs will rely on the presentations and testimony of Dr. Barbara Bergmann. Dr. Bergmann's studies are complete at this time.

31. Defendant will rely on the presentations and testimony of Dr. Finis Welch and his reports have been completed with the exception of a possible report on salary administration issues involved in the state action.

32. Each party will be entitled to present written, not testimonial, rebuttal to the submissions and testimony of the other side's expert presentations. Each party is to be limited to one written rebuttal report (other than any critique that may be performed by the principal statisticians, Drs. Bergmann and Welch, which critiques may be by live testimony or written submissions).

33. The parties and the Court are in agreement that "rebuttal evidence" is not to be in the nature of an additional or new study but rather a critique of the studies done by Drs. Bergmann and Welch. The parties acknowledge that there may be grey areas in terms of what an "additional study" as opposed to a "critique" is. However, the parties and the Court are in agreement that any additional studies that, are run must *solely and directly* critique the other side's study in the sense that a rebuttal study, for instance, may attempt to show that the numerical result was wrong, that the methodology was wrong, or that the studies should have included or excluded certain variables which, if exclud-

---

* Much as a party might introduce evidence which predates the statute of limitations to demonstrate a tendency on the part of the defendant as opposed to evidence introduced to prove liability.

ed or included, would provide a different result. However, there is to be no study done under the guise of "rebuttal" which provides a "new look" or "new approach" with the argument that this implicitly critiques the primary studies presented. Defendant may introduce testimonial and documentary evidence regarding the unreliability, inaccuracy and incompleteness of pre-1976 computerized data and plaintiffs may rebut this evidence. Defendant may also introduce descriptive statistics to rebut the descriptive statistics introduced by plaintiffs as Exhibits 1–10.

34. The Court may utilize its own expert to advise the Court on the validity and strength of the parties' submissions. If the Court's expert deems it essential for his/her analysis to have specified facts available then, on demand from the Court, such facts will be supplied on a basis to be determined by the Court. The defendant will defray the cost of the Court's consulting expert, if any.

If the Court deems it necessary to hear evidence concerning any area or issue (beyond facts relating to statistics), then the parties will provide witnesses or documentation as directed by the Court.

### III. PLAINTIFFS' FEES AND COSTS

35. Defendant will pay the reasonable fees and costs incurred by plaintiffs in prosecuting this action through December 19, 1983, subject to approval of the Court. Any fees to be paid will be determined on an actual reasonable basis (without lode star factor) or as agreed upon by the parties, subject to approval of the Court.

36. Plaintiffs and defendant agree that the presentation of plaintiffs' statistical evidence, as well as any rebuttal efforts plaintiffs choose to make, will involve the incurrence of additional professional fees and costs. In order to avoid the phenomenon that defendant will end up financing the preparation for and presentation of plaintiffs' rebuttal effort, the parties agree that defendant is obligated to pay for additional expert fees and charges only up to a maximum of $10,000.00. If the costs and expenses of plaintiffs' expert witnesses and consultants as incurred after Monday, December 19, 1983, exceed the sum of $10,-000.00, payment therefor shall be the sole responsibility of plaintiffs or their counsel. It is understood that the maximum charge of $10,000.00 shall include any studies undertaken in preparation for and the testimony of the experts and rebuttal witness as well as those witnesses' personal costs and expenses.

37. Defendant will pay the plaintiffs' reasonable actual costs and fees (other than statistical costs) incurred in connection with the conclusion of this proceeding from and after December 19, 1983, as approved by the Court. Plaintiffs and defendant agree that one of the purposes of this settlement is to minimize costs attendant trial and that the plaintiffs' utilization of personnel will be governed by this concern.

38. In the event there is any dispute as to the reasonableness of a claimed charge for fees or costs (or the overall amount) the dispute will be resolved in accordance with a procedure to be set by the Court.

39. The Court finds that the parties' agreement with respect to the payment of fees and costs to be determined was not a factor improperly motivating the parties' settlement negotiations or agreement.

### IV. PAYMENT AND DISTRIBUTION OF THE MONETARY AWARD

#### A. INTEREST AND ADMINISTRATION COSTS

40. Defendant agrees that it will pay, as of December 23, 1983 interest at the then prevailing prime rate on the amount of the award that will eventually be made by the Court. This interest is to be added to the award for distribution to the plaintiffs.

41. The defendant will pay reasonable fees and costs incident to the administration of the award distribution; however, defendant will not be responsible for the cost of resolving any claims made by a plaintiff that the amount of money provid-

ed her as a result of any procedure determined by plaintiffs is inadequate or otherwise inappropriate.

### B. DISTRIBUTION TO NAMED PLAINTIFFS AND WITNESSES

42. A fund of $400,000.00 to $630,000.00 will be divided among named plaintiffs and class members who were identified as potential witnesses by plaintiffs' counsel. The amounts provided for the named plaintiffs, which were reviewed and are approved by the Court, represent plaintiffs' counsel's judgment of appropriate compromises of their specific claims of discrimination as well as reimbursement for personal expenses and risks incurred by them in acting as named plaintiffs. The amounts provided for potential witnesses are intended to reimburse them for the personal expenses and sacrifices they made in acting as witnesses or otherwise assisting plaintiffs' counsel in preparing for trial.

43. The specific amounts allocated to each named plaintiff and witness will depend on the Court's award of back pay to the class. The minimum and maximum amounts allocated to each plaintiff and witness are set out in Appendix A of this Judgment. If the Court awards $1.5 million to the class, the plaintiffs and witnesses will receive the minimum amount next to their name. If the Court awards $4.5 million to the class, the plaintiffs and witnesses will receive the maximum next to their name. If the Court awards an amount to the class between $1.5 million and $4.5 million, the amounts allocated to the plaintiffs and witnesses will be adjusted accordingly.

44. For *named plaintiffs*, the amounts listed in Appendix A represent their total recovery. For the *witnesses* listed in Appendix A, these amounts are in addition to whatever monies they may be entitled to as claimants under this settlement agreement.

### C. DISTRIBUTION TO PLAINTIFFS OTHER THAN NAMED PLAINTIFFS AND WITNESSES

45. Attached hereto as Appendix B is a Claim Form which has been approved by the Court and mailed to all class members. Additionally, the Notice provided in Appendix C hereto has been published on two dates in the *Detroit News* and the Detroit *Free Press* as provided by the Court.

46. Only persons making a valid claim by returning the Claims Form to Plante & Moran, agents for the parties for the purpose of administering this settlement, within 30 days of the mailing of the claim form described above are entitled to participate in the distribution of the monetary award. The amount to be received by a class member, if any, is to be determined in accordance with a procedure approved by the Court as outlined in Appendix D hereto. In the absence of a showing of bad faith the Court will deem any distribution made by plaintiffs' counsel which is consistent with the spirit of Appendix D to be proper, final and binding on the affected class member.

### V. SCOPE AND EFFECT OF THIS CONSENT JUDGMENT

47. The effect of this Judgment will be that all complaints of sex discrimination that were raised or could have been raised in these consolidated class actions will be considered settled and released. The Court is also advised that the parties have agreed to dismiss, with prejudice, a class action pending in state court, captioned *Dalley et al v. Blue Cross Blue Shield of Michigan,* C.A. No. 83–316305–CZ (Wayne County Circuit Court).

48. The fact that claims, as defined in the following section, will be considered released and settled means that any sex discrimination complaint or charge that any present or former female MAT employee of Blue Cross Blue Shield of Michigan may have or may have had will be discharged and no further complaint or litigation may be maintained by any class member on account of such settled claim. This will be the result regardless of whether a class member receives a monetary award in accordance with the claims procedure incorporated in this Consent Judgment or whether that class member receives no monetary award.

49. The claims that will be settled and released are any claims of sex discrimination that were or could have been raised in this action, including, by way of example but not limitation, claims of sex discrimination regarding initial assignment (whether to the MAT or clerical ranks), promotion, classification, pay or salary administration practices, training or discipline, whether such claims could have been raised, or were raised, under state or federal law. However, only actions that occurred, and could have been complained of, prior to the entry of this Consent Judgment will be considered settled and so released.

50. The class whose claims will be released includes: All present and former female employees located at BCBSM's headquarters building at 600 Lafayette East, Detroit, Michigan 48226, or the "Jefferson Building," who are non-clerical, full-time, female employees denominated "SAT" or "MAT" employees by Michigan Medical Service (Blue Shield) or Michigan Hospital Service (Blue Cross) prior to consolidation of the companies in 1975; all female employees designated "MAT" after consolidation and during the time the term "MAT" was utilized; after cessation of the use of the term MAT, all female employees denominated "exempt" employees by BCBSM, including employees of BCBSM in grades non-exempt 8 through 15, whether or not covered by one of the Company's collective bargaining agreements.

51. This Order will remain in effect for four (4) years from the date of entry.